CHASE MANHATTAN BANK, N.A., recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD, SECCIÓN TERCERA DE BAYAMÓN, recurrido.

*Número:* RG-89-364          *Resuelto:* 26 de julio de 1994

*Julio Nigaglioni Arrache,* de *Ledesma, Palou & Miranda,* abogado del recurrente; el Registrador recurrido compareció por escrito.

## SENTENCIA

Examinados y estudiados los planteamientos en el caso de autos, se dicta sentencia para confirmar la nota que deniega la inscripción solicitada por el peticionario recurrente, Chase Manhattan Bank, la cual fuera expedida el 9 de mayo de 1989 por la Registradora de la Propiedad de la Sección Tercera de Bayamón, Hon. Lirio Bernal Sánchez.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. La Juez Asociada Señora Naveira de Rodón emitió una opinión concurrente, a la cual se unió el Juez Presidente Señor Andréu García. Los Jueces Asociados Señores Negrón García, Rebollo López y Hernández Denton no intervinieron.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión concurrente de la Juez Asociada Señora Naveira
de Rodón, a la cual se une el Juez Presidente Señor
Andréu García.

I

*Hechos*

Riverview Development Corporation (en adelante River-
view) era dueña de una finca denominada San Gerónimo,
sita en el Barrio Hato Tejas de Bayamón, y pretendía
urbanizarla.([1]) A ese fin, el 17 de mayo de 1968, la Junta de
Planificación de Puerto Rico, emitió una resolución en el
Caso Núm. 65–1706 Lot. En ésta ordenó que se segregara
una parcela, con cabida de 3.8795 cuerdas, para que se
constituyera provisionalmente un "área de parque y/u [sic]
usos públicos no incompatibles con una urbanización".
Además, requirió que se estableciera una servidumbre de
paso para proveerle acceso. Finalmente, dispuso que River-
view otorgara una escritura pública a esos efectos.

El 22 de agosto de 1968 Riverview, la Administración de
Parques y Recreo Públicos de Puerto Rico, en representa-
ción del Estado Libre Asociado de Puerto Rico (en adelante
Estado), y los acreedores hipotecarios de Riverview otorga-
ron la Escritura Núm. 32 de Segregación, liberación de te-
rreno para parque y constitución de servidumbre, ante el
notario Manuel García Malatrasi.([2]) Los acreedores hipote-

---

([1]) Esta contaba con una cabida de 147.1917 cuerdas o 568,668.25 metros cua-
drados según surge de su inscripción registral, Finca Núm. 35572.

([2]) La parcela segregada y cedida al Estado se describió así:

"—Urbana: Parcela de terreno denominada Parque radicada en el barrio Hato
Tejas del Municipio de Bayamón, con cabida de tres cuerdas con ocho mil setecientos
noventa y cinco diez milésimas de otra (3.8796) y en lindes: por el Norte en una
distancia total de doscientos cuarenta y cuatro metros con cuatro centímetros
(244.04), con terrenos de José Menéndez Monroig, con la calle quince A (15-A) y con
el Bloque 'K' de la Urbanización Riverview; por el sur, en una distancia total de
doscientos treinta y cuatro metros cincuenta y cuatro centímetros (234.54) con paseo

carios comparecieron para liberar la finca segregada del gravamen de sus hipotecas. El Estado aceptó la parcela y la servidumbre de paso a favor de ésta por el precio nominal de un dólar ($1).

En la escritura se hizo constar que la parcela cedida al Estado sería destinada por éste o por cualquier agencia gubernamental, estadual o municipal como área libre de parque, o para otros fines compatibles con una urbanización. La cesión se verificó conforme a las Leyes Núm. 213 de 12 de mayo de 1942 (23 L.P.R.A. sec. 1 *et seq.*), Núm. 156 de 11 de mayo de 1948 (15 L.P.R.A. sec. 45 *et seq.*) y Núm. 25 de 8 de junio de 1962 (23 L.P.R.A. sec. 30a *et seq.*).

En la escritura se describió la cesión como de carácter provisional, porque el Estado disponía de un término de tres (3) años, contados a partir de la fecha del otorgamiento de la escritura, para seleccionar otros terrenos a ser utilizados como parque. Transcurrido el término, sin que se hubiese hecho selección alguna, la cesión provisional se convertiría "ipso facto en una dedicación permanente y el título absoluto de dominio de la parcela ... queda[ría] investido libre de cargas o gravamen alguno, en el Estado Libre Asociado de Puerto Rico para ser destinado y dedicado a los usos indicados anteriormente, con el expreso consentimiento de los comparecientes Corporación [Riverview] y Administración [de Parques y Recreo Públicos de Puerto Rico]".

Esta escritura fue presentada al Registro de la Propiedad en Bayamón. La segregación y el dominio a favor del Estado quedaron inscritos.(³)

---

público que da a los Bloques 'R', 'S', 'T', y 'BB', y con las calles números 16-A, 17-A y 22-A de la misma urbanización; por el este, en una distancia de noventa y cuatro metros sesenta y nueve centímetros (94.69) con el bloque 'BB' y con la calle número veinticinco A (25-A) de la misma urbanización; y por el Oeste en una distancia total de setenta y un metros nueve centímetros (71.09) con el bloque 'K' y con la calle número quince A (15-A) de la misma urbanización."

(³) La parcela cedida se inscribió como Finca Núm. 35572. Esta parcela fue inscrita originalmente al T. 781, folios 236–239 de Bayamón Sur. Luego pasó al T.

El 19 de abril de 1977 Riverview y el Banco de Ponce (en adelante Banco) otorgaron una escritura de Dación en pago, ante el notario José A. Lavastida. En ésta Riverview entregó al Banco la finca San Gerónimo en pago de una deuda de $2,670,674.35, evidenciada por veintiún (21) pagarés hipotecarios, cuyo legítimo tenedor era el Banco. De esta manera el Banco advino dueño de la finca.

En la escritura se consignó que la finca San Gerónimo fue objeto de varias segregaciones que redujeron su cabida.([4]) Las partes acordaron que el Banco adquiriría el dominio sobre la finca, con la cabida que ésta resultara tener en el Registro de la Propiedad al momento en que se inscribieran los derechos que aparecían relacionados en la escritura. Sobre este particular se consignó, específicamente: "teniéndose por satisfecho el Banco desde ahora de la totalidad de su crédito con la cabida de la finca que así resulte."

El 24 de agosto de 1983 la Administración de Reglamentos y Permisos (en adelante A.R.Pe.) emitió una resolución en el Caso Núm. 65–1706 Lot. En ella, y a solicitud del Banco, se dejó sin efecto la cesión al Estado de la parcela de 3.8795 cuerdas, a ser destinada como parque. En su lugar se ordenó la segregación de una parcela denominada "parque activo" con una cabida de 2.69 cuerdas. El remanente de 1.1336 cuerdas pasaría a ser propiedad del Banco.([5])

---

155, folio 97 de Bayamón Norte, como la Finca Núm. 7244. En la certificación literal de los asientos de esta finca aparece señalado como un error, mediante el uso de paréntesis y la palabra "digo", la inscripción de ésta como Finca Núm. 5406, al T. 120, folio 51 de Bayamón Norte.

([4]) Según consta en el primer párrafo de la Escritura, la cabida se redujo a 388,440.06 metros cuadrados.

([5]) En la Certificación de mesura de 20 de junio de 1985, suscrita por el agrimensor Víctor L. Santiago se explica la razón de la diferencia entre la cabida original de 3.8795 cuerdas y la que resulta del parque activo (2.69 cuerdas) y el remanente (1.1336 cuerdas) de 3.8236 cuerdas.

"Cuarto: Que la diferencia que resulta de la cabida original de tres punto ocho mil setecientos noventa y cinco cuerdas (3,8795 cuerdas), a tres punto ochenta y dos mil treinta y seis cuerdas (3.8236 cuerdas), es decir cero punto cero quinientos cincuenta y nueve cuerdas (0.0559 cuerdas) equivalentes a doscientos diez y nueve

El 7 de octubre de 1983 el Banco y el Departamento de Recreación y Deportes, representado por su Secretario interino, Edwin Rivera Paulo, otorgaron la Escritura Núm. 171 de Rescisión de dedicación provisional, segregación y cesión permanente para uso público, ante el notario Manuel García Malatrasi. En ésta las partes expresaron que rescindían y dejaban sin efecto la cesión de la parcela de 3.8795 cuerdas a favor del Estado, en conformidad con la Resolución de A.R.Pe. En virtud de esto señalaron que la parcela denominada "parque" revertía al Banco a fin de que éste segregara una parcela de 2.69 cuerdas. Esta última fue cedida permanentemente al Estado, como área de parque, por un valor nominal de cincuenta dólares ($50).[6] El Banco retuvo el dominio sobre el remanente de 1.1336 cuerdas.

El Banco vendió la finca remanente a J.V.M. Investments, Inc. por el precio de sesenta y siete mil dólares ($67,000). Esta compraventa aparece recogida en la Escritura Núm. 404 otorgada el 11 de diciembre de 1984 ante el notario Héctor L. Torres Vilá.[7] J.V.M. Investments, Inc., a

---

punto noventa (219.90) metros, se debe a que la servidumbre de paso de la calle número uno de la Urbanización Estancias de Río Hondo invadió el predio original a consecuencia de un talud de más de tres metros de alto y a que setenta y ocho punto sesenta y ocho (78.68) metros cuadrados se le quitaron a la cabida original para agruparlos al solar Bloque DD-diez y ocho (DD–18)."

[6] La parcela cedida al Estado tiene la descripción siguiente:

"—URBANA: Parcela de terreno denominada "Parque Activo" radicada en el barrio de Hato Tejas, Municipio de Bayamón, con una cabida de dos punto sesenta y nueve (2.69) cuerdas equivalentes a diez mil cuatrocientos cincuenta uno punto cuatro mil ciento veinticinco metros cuadrados (10,451.4125m²) en lindes por el Norte: En cuatro distancias total de ciento ochenta y tres punto diez y nueve metros (183.19 metros) —con la calle número Uno de la Urbanización Estancias de Río Hondo con terrenos eremanentes [sic] y la calle número veinticinco (25) A de la propia urbanización Riverview, por el sur, en una distancia total de ciento sesenta y ocho punto cero cinco (168.05) metros con paseos público que da a los bloques S y T con las calles 16 A (diez y seis A) diez y siete A (17-A) y veintidós A (22-A), Bloque CC, por el Este en tres distancias total de noventicinco punto diez metros (95.10 metros) con terrenos remanentes."

[7] Esta escritura carece de la descripción de la finca objeto de la compraventa y erróneamente señala en la cláusula cuarta que el Banco la adquirió por ejecución de hipoteca. La escritura fue presentada para inscripción en el Asiento Núm. 197 del Diario 68 del Registro de la Propiedad, Sección de Bayamón.

su vez, vendió la finca a San Ramón Development Corporation.[8]

El 20 de mayo de 1987 se presentó para inscripción en el Asiento Núm. 196 del Diario 68 del Registro de la Propiedad, Sección de Bayamón, la Escritura Núm. 171, otorgada el 7 de octubre de 1983 ante el notario Manuel García Malatrasi.[9] Esta es la escritura que recoge la rescisión de la cesión de la parcela parque de 3.8795 cuerdas a favor del Estado, la segregación y cesión de la parcela parque activo de 2.69 cuerdas y la adjudicación al Banco del dominio sobre el remanente de 1.1336 cuerdas.

El 12 de junio de 1987 San Ramón Development Corporation y The Chase Manhattan Bank, N.A. (en adelante Chase) otorgaron la Escritura Núm. 6 de Constitución de Hipoteca ante el notario Aurelio Emmanuelli Belaval. Por medio de ésta Chase le prestó a San Ramón Development Corporation la suma de novecientos cincuenta y tres mil quinientos dólares ($953,500) y ésta constituyó una hipoteca sobre el remanente de 1.1336 cuerdas[10] en garantía

---

[8] Este hecho surge de los alegatos del recurrente y la Registradora. Ambos señalan que la compraventa aparece recogida en la Escritura Núm. 24 de 12 de junio de 1987 autorizada por el notario Juan Méndez Solís. La Registradora nos señala que la escritura fue presentada para inscripción en el Asiento Núm. 203 del Diario 69 del Registro de la Propiedad, Sección de Bayamón.

[9] Según surge de la Escritura Núm. 404 de 11 de diciembre de 1984, autorizada por el notario Héctor Torres Vilá y de las anotaciones del Registrador en la Escritura Núm. 171 de 7 de octubre de 1983 autorizada por el notario Manuel García Malatrasi, ésta última fue presentada con anterioridad en el Registro. El 17 de octubre de 1983 se presentó para inscripción en el Asiento Núm. 206 del Diario 68 del Registro de la Propiedad, Sección de Bayamón. Por nota al pie de la escritura, de 5 de diciembre de 1984, se señala que ésta generó inscripción. Sin embargo, luego aparece una anotación sobre notificación de falta de 19 de febrero de 1985 y otra en la que se expresa que el asiento de presentación caducó el 19 de abril de 1985. A esos efectos se escribió la palabra "cancelada" junto a la nota de inscripción.

[10] En la escritura aparece la siguiente descripción del remanente:
"URBANA: Parcela de terreno denominada remanente radicada en el barrio Hato Tejas del término municipal de Bayamón, Puerto Rico, con una cabida de uno punto trece treinta y seis (1.1336) cuerdas en lindes por el Norte en tres distancias con un total de sesenta y seis punto noventa y dos (66.92) metros con la calle número Uno (1) de la urbanización Estancias de Río Hondo, el bloque K y la calle quince-A (15-A); por el Sur, en una distancia total de setenta y cuatro punto treinta (74.30) metros con paseo peatonal que une las calles quince (15) y dieciséis-A (16-A), la calle dieciséis-A (16-A) y parte del paseo peatonal que une las calles dieciséis-A (16-A) y diecisiete-A

del pago de la deuda. Esta escritura fue presentada para inscripción en el Asiento Núm. 204 del Diario 69 del Registro de la Propiedad, Sección de Bayamón.

Posteriormente, según surge del alegato de la Registradora, se presentaron al Registro cerca de dieciséis (16) escrituras de segregación, liberación y compraventa de solares que se segregaron del remanente de 1.1336 cuerdas, con sus correspondientes escrituras de hipoteca.[11] También están presentadas la Escritura Núm. 7 de 11 de mayo de 1988 sobre constitución de servidumbre, autorizada por el notario Juan M. Méndez Solís, y la Escritura Núm. 8 de 11 de mayo de 1988 sobre condiciones restrictivas autorizada por el mismo notario y acompañada por una certificación sobre constitución de servidumbre de paso expedida el 28 de marzo de 1988 por Rafael Betancourt.

El 24 de febrero de 1989 la Registradora notificó su calificación en relación con la Escritura Núm. 171 otorgada el 7 de octubre de 1983 ante el notario Manuel García Malatrasi.[12] Específicamente señaló que ésta adolecía de diez (10) faltas, a saber:

1. Falta tracto sucesivo. Surge del Registro que el único dueño de los terrenos es el E.L.A. Art. 57 Ley Hipotecaria.
2. Indebida disposición de propiedad pública en violación de las leyes investidas de orden público.
3. Ningún funcionario público tiene facultad en ley para so color de rescisión disponer a título gratuito de propiedad pública.
4. La resolución emitida por ARPE el 24 de agosto de 1983

---

(17-A); por el Este, en una distancia total de ochenta punto diez (80.10) metros con área dedicada a parque activo; y por el Oeste, en una distancia total de sesenta y seis punto setenta y ocho (66.78) metros con la calle quince (15), quince-A (15-A) y el bloque K."

[11] La Registradora señala que éstas corresponden al desarrollo residencial urbanización Chalets del Río.

[12] En esta misma fecha la Registradora notificó faltas a la Escritura Núm. 24 de 12 de junio de 1987 autorizada por el notario Juan M. Méndez Solís, y a la Escritura Núm. 6 otorgada el 12 de junio de 1987 ante el notario Aurelio Emmanuelli Belaval. El texto de la notificación es el siguiente:

"Los documentos que le dan tracto están defectuosos y han sido notificados con fecha de hoy 24 de febrero de 1989. Se acompaña copia de dicha notificación."

en el caso #65–1706 Lot. la cual se acompaña como documento complementario es nula de su propia faz. Ningún funcionario administrativo tiene facultad en ley para determinar por sí mismo que se deja sin efecto la dedicación a uso público provisional de la parcela para parque con cabida de 3.8795 cdas.

5. La transacción pretendida viola la reglamentación vigente en materia de disposición de propiedad pública. Véase Título 15 LPRA Sec. 45 y S.S. y Título 28 Sec. 31 y S.S.

6. No hay causa de ley alguna que permita la acción rescisoria que pretende la escritura #171 titulada "Rescisión de Dedicación Provisional, Segregación y Cesión Permanente para Uso Público".

7. En virtud de la escritura pública #32 de 2 de agosto de 1978[sic] el E.L.A. adquiere título de dominio, en forma permanente, pasados tres años. La escritura pública #171 fue otorgada en fecha posterior a la fecha en que ya el E.L.A. era dueña en pleno dominio de la parcela de 3.8795 cdas.

8. Debe acompañarse como complementario la escritura pública #32 de 22 de agosto de 1978[sic] ante Manuel García Malatrasi. Véase Art. 64–68 Ley Hip.

9. El Sr. Edwin Rivera Paulo no podía representar al E.L.A. ni pretendió hacerlo en la escritura #32 [sic] aludida a la que comparece únicamente como representante de Parques y Recreos [sic]. Tampoco hay facultades acreditadas de Edwin Rivera Paulo para representar a Parques y Recreos [sic].

10. De haber sido válida la transacción informada tampoco se ha hecho la rectificación de cabida conforme lo requiere el Art. 240 y 247 de la Ley Hipotecaria. Pendiente de inscripción además se encuentran los documentos presentados a los asientos 197 del Diario 68, 203 y 204 del Diario 69.

El 16 de marzo de 1989 Chase, como parte interesada en la inscripción de la Escritura Núm. 171 de 7 de octubre de 1983 autorizada por el notario Manuel García Malatrasi presentó a la Registradora un Escrito de Recalificación. Ésta decidió mantener su calificación original y el 9 de mayo de 1989 emitió una Denegatoria a esos efectos. Además se reafirmó en todas las faltas notificadas.

El 30 de mayo de 1989 Chase recurrió ante nos de la Denegatoria de la Registradora mediante un recurso gubernativo. En éste señala las siguientes objeciones a la calificación:

(A) Incidió la Honorable Registradora al sostener que es ile-

gal la rescisión efectuada por el Departamento de Recreación y Deportes y el Banco de Ponce, mediante la escritura número 171, otorgada ante el notario Manuel García Malatrasi.

(B) Incidió la Honorable Registradora al sostener que el Departamento de Recreación y Deportes no tenía facultad en ley para comparecer al acto y rescindir la cesión efectuada a su favor en 1968.

(C) Incidió la Honorable Registradora al sostener que la escritura presentada por la recurrente carecía de tracto registral.

La Registradora ha comparecido, y con el beneficio de su alegato pasamos a considerar las objeciones señaladas. Sin embargo, y en primer lugar, consideraremos la legitimación de Chase para oponerse a la calificación de la Registradora y un señalamiento de ésta última en cuanto a faltas consentidas por el recurrente Chase.

## II

*Chase—parte interesada*

La Ley Hipotecaria y del Registro de la Propiedad (en adelante Ley Hipotecaria) en sus Arts. 70 y 76 (30 L.P.R.A. secs. 2273 y 2279), y el Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad (en adelante Reglamento General) en su Art. 88.1 (30 L.P.R.A. sec. 2003–88.1, edición especial) disponen que el interesado en la inscripción podrá presentar Escrito de Recalificación y un recurso gubernativo contra la calificación del Registrador. A su vez el Art. 62.3 del Reglamento General, 30 L.P.R.A. sec. 2003–62.3, edición especial, señala que "[s]e entenderá por interesado en asegurar el derecho que se desea inscribir todo poseedor de un derecho o título aunque no conste en el documento que se presenta y cuya inscripción dependa de la inscripción de éste".

En virtud de estas disposiciones de ley, y de acuerdo con los hechos reseñados, Chase está legitimado para oponerse a la calificación de la Registradora. Consideremos ahora el

señalamiento de la Registradora relativo a que Chase consintió algunas de las faltas notificadas.

## III

*Faltas consentidas*

La Registradora considera que Chase ha consentido a algunas de las faltas que le fueron notificadas.[13] Examinemos, pues, esto.

Las faltas Núms. 1 y 9 están íntimamente relacionadas. Por lo tanto las consideraremos en conjunto. Del examen de las faltas notificadas se desprende que las enumeradas 2–6 se refieren esencialmente a la legalidad de la rescisión de la cesión al Estado de la parcela denominada "parque" de 3.8795 cuerdas. Por ende, las examinaremos como una sola.

La Núm. 7 no constituye una falta en sí. La Registradora hace unas afirmaciones pero no señala error o defecto alguno en el título presentado que requiera corrección. Ante un señalamiento como éste, la parte interesada se ve imposibilitada de actuar según dispone la Ley Hipotecaria, mediante la corrección del defecto o su objeción vía Escrito de Recalificación.[14] Su inacción en este caso no puede interpretarse como que consintió al alegado defecto del título.[15]

Las faltas octava y décima no fueron discutidas por el recurrente en el Escrito de Recalificación ni en el Recurso Gubernativo. Por lo tanto, no las consideraremos. Sobre faltas no discutidas por el promovente del Recurso Gubernativo hemos señalado que "[n]uestro derecho registral es-

---

[13] En su alegato, ésta señala que el Recurso Gubernativo del recurrente Chase sólo se refiere a las faltas notificadas con los Núms. 1, 4 y 7. Por lo tanto, concluye que Chase consintió las faltas con los Núms. 2, 3, 5, 6, 9 y 10.

[14] Véanse: Arts. 69-70 de la Ley Hipotecaria y del Registro de la Propiedad (en adelante Ley Hipotecaria) 30 L.P.R.A. secs. 2272–2273.

[15] Por lo tanto, por no constituir una falta, según la Ley Hipotecaria, no la examinaremos.

tima cometidos dichos defectos después de pasados los veinte (20) días para interponer la 'recalificación'. ... Art. 89.3 del Reglamento General, 30 L.P.R.A. sec. 2003-89.3, edición especial. Sin más discusión, procede confirmarlas". *Pino Development Corp. v. Registrador*, 133 D.P.R. 373, 391 (1993). Por lo tanto, pasaremos a considerar las faltas enumeradas 1, 2–6 y 9.

## IV

*Falta de tracto sucesivo*

La Registradora sostiene que existe falta de tracto sucesivo porque el titular registral[16] de la finca denominada "parque" es el Estado y en la Escritura Núm. 171, objeto de este recurso, comparece como titular de la finca el Departamento de Recreación y Deportes. Para determinar la corrección de esta aseveración es necesario que primero examinemos algunas normas generales sobre el principio de tracto sucesivo.

El principio de tracto sucesivo aparece recogido en el Art. 57 de la Ley Hipotecaria. Éste dispone que "[p]ara registrar documentos por los que se declaren, transmitan, graven, modifiquen, o extingan el dominio y demás derechos reales sobre bienes inmuebles, deberá constar previamente registrado el derecho de la persona que otorgue o en cuyo nombre sean otorgados los actos o contratos referidos". 30 L.P.R.A. sec. 2260. Este principio hipotecario procura que el "historial jurídico de cada finca inmatriculada, respecto de los sucesivos titulares registrales que ha-

---

[16] El titular registral es "aquel sujeto que, al hacer constar en el Registro un acto jurídico, queda designado en los libros como portador de un derecho, facultad o expectativa sobre un inmueble inmatriculado. La titularidad dura hasta que el Registro publica, en el mismo folio, otra contradictoria. ... Por definición, el titular registral figura en el folio como sujeto de algún derecho; sea adquirido como otorgante del acto o contrato inscrito, sea recibido por otra causa". J.L. Lacruz Berdejo, F. Sancho Rebullida, *Derecho inmobiliario registral*, Barcelona, Ed. Bosch, 1977, págs. 111–112.

yan adquirido el dominio o derecho real sobre la misma, figuren con plena *continuidad ininterrumpida* en su encadenamiento de adquisiciones sucesivas, cronológicamente eslabonadas las unas con las otras, de modo que el transferente de hoy sea el adquirente de ayer, y que el titular registral actual sea el transferente de mañana". (Énfasis en el original.) R. Roca Sastre y L. Roca-Sastre Muncunill, *Derecho Hipotecario*, 7ma ed., Barcelona, Ed. Bosch, 1979, T. II, pág. 327. Véanse, además: J. Lacruz Berdejo y F. Sancho Rebullida, *Derecho Inmobiliario Registral*, Barcelona, Ed. Bosch, 1977, págs. 339–341; J.M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario*, 2da ed., Madrid, Ed. Marcial Pons, 1989, T. I, pág. 428; A. De Cassio y Corral, *Instituciones del Derecho Hipotecario*, Madrid, Ed. Civitas, 1986, pág. 130; J.A. Álvarez Caperochipi, *Derecho Inmobiliario Registral*, Madrid, Ed. Civitas, 1986, pág. 104. Así el principio de tracto sucesivo alcanza su propósito de "mantener el enlace o conexión de las adquisiciones por el orden regular de los titulares registrales sucesivos, a base de formar todos los actos adquisitivos inscritos una continuidad perfecta en orden al tiempo, sin salto alguno, de suerte que ello refleje el historial sucesivo de cada finca inmatriculada". (Escolio omitido.) Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 327. Véanse, además: D. Martínez Irizarry, *Los principios hipotecarios bajo la nueva legislación en Puerto Rico*, 50 Rev. Jur. U.P.R. 195, 215 (1981); *Ríos Román v. Registrador*, 130 D.P.R. 817 (1992). De esta manera el principio de *tracto sucesivo* pretende garantizar la continuidad en la identificación del titular registral. *Pino Development Corp. v. Registrador*, supra, pág. 380.

El tratadista Roca Sastre nos señala que el principio de tracto sucesivo se manifiesta de dos (2) maneras[17] en los

---

[17] Aunque existe divergencia entre algunos tratadistas sobre el número de manifestaciones, en cuanto a la esencia de éstas están contestes. Véase J.M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario*, 2da ed., Madrid, Ed. Marcial Pons, 1989,

asientos del Registro de la Propiedad. Una de estas manifestaciones la constituye el régimen de previa inscripción del derecho a favor de la persona disponente o a la que haya de perjudicar la inscripción a practicar, de manera que cada acto dispositivo cuente con su propio asiento. Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 331. La otra manifestación denominada "tracto sucesivo abreviado" permite que en un mismo asiento se hagan constar ordenadamente sucesivos actos dispositivos con las correspondientes adquisiciones concatenadas. Íd.; Lacruz Berdejo y Sancho Rebullida, *op. cit.*, pág. 344. La controversia ante nos requiere que examinemos la primera de estas manifestaciones.

El requisito de previa inscripción le impone al Registrador la obligación de comprobar si el derecho del disponente consta inscrito a su favor en el Registro de la Propiedad. Si el título presentado aparece otorgado por una persona distinta de la que tiene inscrita el derecho, es decir el titular registral, se produce el cierre del Registro de la Propiedad y la imposibilidad de inscribir. Álvarez Caperochipi, *op. cit.*, págs. 104–105. En estos casos el Art. 57 de la Ley Hipotecaria, *supra*, ordena al Registrador que deniegue la inscripción. *Aponte Donato v. Registrador*, 115 D.P.R. 699, 700 (1984); *Pino Development Corp. v. Registrador*, supra.

En el caso ante nos, según surge de la certificación literal de los asientos de la finca denominada "parque", el titular dominical de ésta es el Estado. Sin embargo, en la primera cláusula de la Escritura Núm. 171 se señala que el Departamento de Recreación y Deportes es el dueño del inmueble. Ante esta discrepancia entre quien aparece como dueño de la finca en el Registro de la Propiedad y quien se señala en la escritura, la Registradora procedió a denegar la inscripción y a notificar el defecto de falta de tracto. Sin embargo, un examen detenido de la escritura

---

T. I, págs. 428–429; F. Campuzano y Horma, *Apéndice a la materia de Derecho inmobiliario y legislación hipotecaria*, Madrid, Ed. Reus, 1944, págs. 215–216.

nos demuestra que la aparente falta de tracto se debe a un error en la escritura y no a una divergencia entre la realidad registral y la extrarregistral. Examinemos el contenido de la escritura a esos efectos.

Los comparecientes en la escritura fueron el Banco y el Departamento de Recreación y Deportes, representado por su Secretario Interino. No aparece expresión alguna relativa a que el Departamento compareciera en representación del Estado.

En la cláusula primera de la parte expositiva se señala que el Departamento es el dueño de la finca. Sin embargo, en esta misma cláusula, incorrectamente, se expresa que la finca aparece inscrita tanto a favor del Estado como del Departamento.([18]) Luego, en las cláusulas quinta y sexta se expresa que el Banco segrega y cede al Estado una parcela denominada "parque activo". Finalmente, se señala que el Departamento de Recreación y Deportes acepta la cesión en el carácter representativo en el que comparece en la escritura.([19])

Un examen integral de la escritura nos lleva a concluir que el Departamento compareció en representación del Estado, como expresamente se señala en la sexta cláusula. La

---

([18]) La cláusula dispone en su parte pertinente:

"Mediante la escritura número treintidós (32) otorgada en San Juan, Puerto Rico el día veintidós (22) de agosto de mil novecientos sesenta y ocho (1968), ante el Notario Público Manuel García Malatrasi, dicha propiedad fue dedicada provisionalmente para uso público, *inscribiéndose a favor del Estado Libre Asociado de Puerto Rico y/o Departamento de Recreación y Deportes*, al folio doscientos treintiséis (236) del tomo setecientos ochenta y uno de Bayamón, inscripción primera de la finca número treinticinco mil quinientos setenta y dos (35,572)." (Énfasis suplido.)

([19]) Las cláusulas quinta y sexta expresan en sus partes pertinentes:

"QUINTO: Que 'El Banco' por la presente SEGREGA, CEDE Y DEDICA, en forma permanente, libre de gravámenes hipotecarios *a favor del Estado Libre Asociado de Puerto Rico*, la siguiente parcela que arroja la siguiente descripción:

.    .    .    .    .    .    .    .

"SEXTO: 'El Banco' por la presente CEDE Y TRASPASA con carácter permanente, con todos sus usos, derechos y servidumbres y cuanto le es anexo y pertinente, *al Estado Libre Asociado de Puerto Rico, la parcela de terreno segregada por esta escritura, y que se describe como PARQUE ACTIVO la cual es aceptada en este acto por el 'Departamento' en el carácter representativo en que dichas partes comparecen en esta escritura.*" (Énfasis suplido.)

afirmación relativa a que el Departamento de Recreación y Deportes es el dueño de la finca denominada "parque", es el resultado de una interpretación incorrecta del asiento registral. Esto claramente se desprende del señalamiento de que el dominio sobre la finca aparece inscrito a favor del Estado y del Departamento. Como señalamos, el asiento registral lo que publica es el dominio a favor del Estado exclusivamente.

La comparecencia del Departamento de Recreación y Deportes en carácter representativo elimina todo aparente problema de falta de tracto. Esto así porque la Ley Hipotecaria no considera la representación como una violación al principio de tracto sucesivo. El Art. 57 de la Ley Hipotecaria, *supra*, lo que exige es que conste "previamente registrado el derecho de la persona que otorgue *o en cuyo nombre sean otorgados los actos o contratos referidos*". (Énfasis suplido.)([20]) El tratadista Roca Sastre sostiene que "el elemento representacional no cae dentro del ámbito del principio de tracto sucesivo". Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 360.([21])

---

([20]) El Art. 70.1 del Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad (en adelante Reglamento General) fue enmendado a fin de incorporar la norma, ya recogida por el Art. 57 de la Ley Hipotecaria, *supra*, de que la representación no provoca un problema de falta de tracto. El Art. 70.1, en su parte pertinente, dispone:

"En caso de que el derecho no conste inscrito a favor del otorgante o del perjudicado por el título presentado por estar inscrito a favor de persona distinta o no estar la finca inmatriculada, el Registrador denegará el asiento solicitado.

"No será necesaria la previa inscripción o anotación a favor de los mandatarios, liquidadores, albaceas y demás personas que con carácter temporal actúen como representantes y dispongan de intereses ajenos en la forma permitida por las leyes." 30 L.P.R.A. sec. 2003–70.1, edición especial.

Esta enmienda entró en vigor el 16 de octubre de 1992.

([21]) Al interpretar el Art. 20 de la Ley Hipotecaria española, correlativo al Art. 57 de la nuestra, este tratadista hace señalamientos que consideramos pertinentes para la interpretación de nuestra ley.

"[R]esulta claramente excluida del juego propio del tracto sucesivo la función representacional, consistente en otorgar un acto jurídico en nombre y por cuenta de otro, recayendo sobre éste los efectos jurídicos consiguientes del acto efectuado en uso del poder representativo. El apoderamiento no es acto inscribible, aunque lleve consigo facultad dispositiva, pues, constituye un simple desdoblamiento de la personalidad, sin provocar cambio alguno de titularidad. Los poderes con facultad enajenativa quedan sujetos a la calificación del Registrador, y constarán consignados en el

La actuación del Departamento de Recreación y Deportes en representación del Estado, titular registral de la finca, elimina todo problema de ausencia de tracto sucesivo. Sin embargo, no podemos ignorar que en la comparecencia de la escritura se omitió declaración alguna relativa a que el Departamento actuaba en representación del Estado. Esta omisión constituyó un error del notario autorizante. Veamos por qué.

El Art. 61 de la Ley Hipotecaria, 30 L.P.R.A. sec. 2264, le impone a los notarios la obligación de incluir en los actos o contratos sujetos a inscripción aquellos datos que deba contener la primera inscripción. Específicamente se refiere a los datos relativos a las personas de los otorgantes.([22]) El Art. 87(4) de la Ley Hipotecaria, por su parte, dispone entre los datos que debe contener la primera inscripción, "[e]l nombre del titular de quien procedan inmediatamente los bienes o derechos que deban inscribirse". 30 L.P.R.A. sec. 2308(4). El Art. 99.2 del Reglamento General exige que si el transmitente es una persona jurídica se le designe por el nombre con que fuese conocida, expresándose también su domicilio y el nombre y demás circunstancias de las personas que en su representación otorgaron el auto o contrato. 30 L.P.R.A. sec. 2003–99.2, edición especial. Estas disposiciones de ley claramente le imponían al notario el deber de expresar en la escritura que el Departamento de Recreación y Deportes comparecía en representación del Estado. El notario erró al no hacerlo. Sin embargo, este defecto de

---

cuerpo del asiento de inscripción del acto representativo, pero no constituyen materia propiamente inscribible. Por consiguiente, hay que considerar excluido del alcance del principio de tracto sucesivo el elemento representacional." (Énfasis suprimido.) Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 361.

Véanse, además: Campuzano y Horna, *op. cit.*, pág. 218; Lacruz Berdejo y Sancho Rebullida, *op. cit.*, pág. 343; Chico y Ortiz, *op. cit.*, T. I, pág. 442; Cossio y Corral, *op. cit.*, pág. 133.

([22]) "Los documentos relativos a actos o contratos sujetos a inscripción, expresarán, por lo menos, todas las circunstancias que necesariamente debe contener la primera inscripción y sean relativas a las personas de los otorgantes, a las fincas y a los derechos objeto de la inscripción." 30 L.P.R.A. sec. 2264.

la escritura se puede subsanar mediante un acta notarial. 4 L.P.R.A. sec. 2047.[23]

Finalmente, la Registradora señala que las facultades del Sr. Edwin Rivera Paulo para representar al Departamento de Recreación y Deportes no fueron acreditadas. En la cláusula de la escritura pertinente a este alegado defecto se expresa:

> DE LA SEGUNDA PARTE: El Departamento de Recreación y Deportes de Puerto Rico, representado en este acto por don EDWIN RIVERO PAULO mayor de edad, soltero ejecutivo y vecino de San Juan, Puerto Rico, en su carácter de Secretario Interino del Departamento de Recreación y Deportes del Estado Libre Asociado de Puerto Rico (en adelante denominado "Departamento"), en uso de sus facultades y deberes conferídosle de acuerdo a las disposiciones de la Ley Número Ciento Veintiseis (126) del trece de junio de mil novecientos ochenta (1980).

Jurisprudencia anterior a la actual Ley Hipotecaria estableció que cuando un funcionario público comparece a la autorización de una escritura en representación de una agencia pública tiene que acreditar en forma auténtica sus facultades representativas. No siendo suficiente la declaración del notario al respecto. *Autoridad de Tierras v. Registrador*, 62 D.P.R. 506, 510–512 (1943); *Nido & Cía, S. en C. v. Registrador*, 74 D.P.R. 789, 802–803 (1953). Vigente la actual Ley Hipotecaria hemos señalado que la no presentación de los documentos que acrediten facultades para representar a otros en el otorgamiento de documentos, es una falta que impide la inscripción. *Kogan v. Registrador*, 125 D.P.R. 636 (1990). El Reglamento General, por su parte, dispone en su Art. 72.1 (30 L.P.R.A. sec. 2003–72.1, edición especial), que los documentos otorgados por mandatarios y que afecten bienes inmuebles o derechos reales

---

[23] La Registradora también notificó como defecto que el Sr. Edwin Rivera Paulo no podía ni pretendió representar al Estado en la escritura porque compareció únicamente como representante del Departamento de Recreación y Deportes. Es innecesario considerar esta falta porque nuestro análisis sobre el carácter de la comparecencia del Departamento dispone de ella.

deberán presentarse acompañados de los documentos acreditativos de las facultades del otorgante para obrar en la capacidad que reclama. Concluimos, por lo tanto, que era necesaria la acreditación de la facultad de representación del señor Rivera Paulo.[24] Pasemos ahora a considerar las faltas relativas a la legalidad del negocio jurídico.

## V

*La calificación registral: validez del negocio jurídico*

Las faltas enumeradas 2–6 se refieren a la validez del negocio jurídico que aparece recogido en la escritura. La Registradora sostiene que la llamada rescisión efectuada por el Banco y por el Departamento de Recreación y Deportes es ilegal y que, específicamente, viola ciertas disposiciones de ley. Además, señala que la resolución administrativa, que refrenda la transacción, es nula. Estos señalamientos requieren que consideremos cuál es el alcance de la facultad calificadora.

La calificación registral viene impuesta por el principio hipotecario de legalidad. Éste requiere que los títulos que pretendan su inscripción en el Registro de la Propiedad sean sometidos a un previo examen, verificación o calificación, a fin de que en los libros hipotecarios solamente tengan acceso los títulos válidos y perfectos. Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 255; Chico y Ortiz, *op. cit.*, T. I, págs. 652–653; Lacruz Berdejo y Sancho Rebullida, *op. cit.*, págs. 353–354. Nuestra Ley Hipotecaria recoge el principio de legalidad en su Art. 64, *supra*. Este dispone que los registradores calificarán, bajo su responsabilidad, la legalidad de los documentos de toda clase en cuya virtud se solicite un asiento. 30 L.P.R.A. sec. 2267.

---

[24] Las disposiciones de la actual Ley Notarial de Puerto Rico relativas al carácter de los otorgantes y su acreditación no son de aplicación por no estar vigentes al momento de la autorización de la escritura en controversia. La anterior Ley Notarial de Puerto Rico no contenía disposiciones sobre el particular.

La calificación constituye el medio o instrumento para hacer efectivo el principio de legalidad. "Mediante ella, los títulos defectuosos son rechazados definitiva o provisionalmente del Registro, ya que en él sólo tienen acceso registral los títulos perfectos. La calificación consiste en el examen, censura o comprobación que de la legalidad de los títulos presentados a registro verifica el Registrador de la Propiedad antes de proceder a la inscripción, en sentido amplio, de los mismos, registrándolos, si ello es procedente, o denegando o suspendiendo su inscripción cuando no estén arreglados a Derecho." (Escolio omitido.) Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, págs. 255–256. En este sentido hemos señalado que el propósito de la función calificadora es negar la legitimación registral a los actos y contratos artificiosos y proveer la fidelidad óptima en los libros del Registro de la Propiedad de manera que acerque su realidad a la externa. *Ramírez Lebrón v. Registrador*, 131 D.P.R. 76 (1992); *Sucn. Santos v. Registrador*, 108 D.P.R. 831, 843 (1979); *Preciosas V. Del Lago v. Registrador*, 110 D.P.R. 802, 812 (1981). Sin embargo, no debe perderse de perspectiva que este examen de la legalidad de los títulos se hace a los únicos efectos de publicar, mediante su inscripción, un derecho real o situación jurídica inmobiliaria. La calificación registral no se extiende a la declaración de la existencia o inexistencia de un derecho dudoso o controvertido entre partes contendientes. Por lo tanto, el examen que hace el Registrador de la legalidad del título presentado se circunscribe a determinar si un título es o no inscribible. Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 265; *Cabrer v. Registrador*, 113 D.P.R. 424, 429 (1982).

Al considerar la naturaleza jurídica de la actividad calificadora hemos concluido que ésta se asemeja a los actos de jurisdicción voluntaria. "[E]l Registrador no es un juez, pues indiscutiblemente es un órgano de la Administración del Estado; [además] no hay nada en el procedimiento de

inscripción y, por tanto, en la calificación registral, que se asemeje a la jurisdicción contenciosa, y mucho que se parece a la jurisdicción voluntaria ... 'la jurisdicción voluntaria implica una cooperación de los órganos oficiales para fijar auténticamente un derecho subjetivo de carácter privado, mira a las futuras relaciones jurídicas, tiende a establecer situaciones claras y busca en un procedimiento solemne, y no en la discusión con un contradictor particular, la energía con que impondrá sus declaraciones *erga omnes'.*" (Citas omitidas y énfasis en el original.) *Preciosas V. Del Lago v. Registrador,* supra, pág. 810. Varios tratadistas españoles sostienen esta posición. Roca Sastre y Roca-Sastre Muncunill, *op. cit.,* T. II, pág. 262; J. Morell y Terry, *Comentarios a la Legislación Hipotecaria,* 2da ed., Madrid, Ed. Reus, 1927, T. 2, págs. 258–259; F. Campuzano y Horma, *Apéndice a la materia de Derecho inmobiliario y legislación hipotecaria,* Madrid, Ed. Reus, 1944, pág. 229.([25])

Examinados estos principios generales sobre la calificación, procede que consideremos cuál es el alcance o ámbito de la función calificadora pues éste es el asunto en controversia en las faltas notificadas 2–6. El Art. 64 de la Ley

---

([25]) Chico y Ortiz, por su parte, sostiene que es inútil tratar de adjudicar a la calificación naturaleza judicial, o administrativa o de jurisdicción voluntaria. Él considera que la calificación posee elementos de cada una de ellas y que por lo tanto es más propio considerar que presenta naturaleza autónoma o sui géneris. En este sentido señala:

"La función registral tiene algo de los aspectos señalados: de una parte se asemeja a la actuación judicial; de otra tiene rasgos administrativos y, por último, guarda cierta semejanza con los actos de jurisdicción voluntaria. Si tiene rasgos de todos ellos quiere decirse que no puede encuadrarse en ninguno de ellos, o, por lo menos, que resulta difícil encuadrarla en alguno de ellos. Se ha caído aquí en la gran trampa que prepararon los pandecistas con su método dogmático de inversión: dadas ciertas características si el derecho examinado coincide con alguna de ellas queda enmarcado en la categoría de que se trate.

"Me he planteado si cabe configurar la función registral en forma autónoma sin necesidad de encuadrarla en instituciones típicas y sigo pensando lo mismo: es una función diferente con caracteres propios y algunos asimilados. Ya comprendo que decir que es autónoma o *sui generis* quizá no sea decir nada, pero creo que son mayores las dificultades intentando encuadrarla en la función judicial o administrativa. Afirmar una situación híbrida de 'jurisdicción voluntaria' puede llevarnos a las mismas orillas doctrinales que la de la calificación como autónoma, *sui generis* o diferente." Chico y Ortiz, *op. cit.,* T. I, pág. 664.

Hipotecaria, *supra*, dispone, en lo pertinente, sobre el alcance de la calificación de documentos notariales:

> Los Registradores calificarán, bajo su responsabilidad la legalidad de los documentos de toda clase en cuya virtud se solicite un asiento. Dicha calificación comprenderá las formas extrínsecas de los documentos presentados, la capacidad de los otorgantes y la validez de los actos y contratos contenidos en tales documentos. Los Registradores fundamentarán su calificación de los actos y contratos a registrarse en los documentos que se presenten, los asientos registrales vigentes y las leyes.
>
> Al calificar los documentos sujetos a registro, los Registradores no están facultados para apreciar la legalidad de las calificaciones efectuadas ni de los asientos extendidos con anterioridad por sus predecesores o por ellos mismos. Tales asientos así como los actos inscritos deberán estimarse válidos, hasta tanto los tribunales declaren su nulidad. 30 L.P.R.A. sec. 2267.

La calificación de documentos notariales se circunscribe a determinar si éstos cumplen con las formas extrínsecas que requiere la ley, verificar la capacidad de los otorgantes y si el negocio jurídico es válido. *Mojica Sandoz v. Bayamón Federal Savs.*, 117 D.P.R. 110, 127 (1986). Para ello el Registrador sólo podrá tomar en cuenta lo que surja de los documentos presentados, los asientos registrales vigentes y las leyes. "El Registrador, al calificar no puede fundarse en lo que no conste en los títulos presentados y en el contenido del Registro, de suerte que, salvo el Derecho aplicable, en funciones de calificación no existen para el Registrador sino estos dos elementos, y ninguno más." Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 279.

En cuanto a la validez del acto o contrato contenido en la escritura, el Registrador ha de comprobar "si el acto jurídico en sí, o sea, el contenido en la escritura pública, es válido o nulo, tanto como tal como en sus condiciones. También ha de calificar la trascendencia real del contenido de este título". Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. 2, pág. 270. Véase, además, Lacruz Berdejo y Sancho Rebullida, *op. cit.*, pág. 356. Sobre este particular, el profesor Vázquez Bote señala que "[r]especto del fondo o validez

intrínseca de los actos y títulos inscribibles, puede y debe calificar el Registrador la verdadera naturaleza del negocio, de manera tal, que cualquier vicio que pueda afectar a dicha validez debe ser invocado como objetable para la inscripción. No debe olvidarse que la función calificadora tiene por finalidad fundamental, destacadamente si de inscripciones se trata, impedir que al Registro accedan actos que carezcan de estabilidad y permanencia; de donde está facultado para requerir el cumplimiento de las normas vigentes, eludiendo cualquier calificación equivocada realizada por las partes o el notario". (Citas omitidas.) E. Vázquez Bote, *Tratado teórico, práctico y crítico de derecho privado puertorriqueño: derecho inmobiliario registral*, San Juan, Ed. Butterworth, 1992, Vol. XV–II, págs. 316–317.

Cuando se trata de documentos notariales, el Registrador tiene amplias facultades calificadoras que le permiten comprobar si el acto jurídico otorgado es válido o nulo. *U.S.I. Properties, Inc. v. Registrador*, 124 D.P.R. 448, 466 (1989). Sin embargo, este aspecto de la calificación registral tiene sus límites. *Alameda Tower Associates v. Muñoz Román*, 129 D.P.R. 698 (1992).

Al Registrador le está vedado actuar como juez. No le incumbe a él declarar la existencia o inexistencia de un derecho dudoso. *Cabassa v. Registrador*, 116 D.P.R. 861, 864 (1986). Como señalamos en *Cabrer v. Registrador*, 113 D.P.R. 424, 432 (1982), la "Ley Hipotecaria no ha convertido al Registrador en un juez cuyos decretos sean determinantes *erga omnes* de la validez de los actos o contratos contenidos en los documentos sometidos a su calificación. Esa autoridad queda reservada a los tribunales de justicia mediante juicios plenarios en que oyen testigos y reciben pruebas aportadas por partes en contienda". Por lo tanto, "[s]in que invada el campo del Tribunal, al que corresponde dirimir controversias y adjudicar derechos, el Registrador ha de comprobar si el caso jurídico en sí, o sea el contenido

de la escritura pública, es válido o nulo, tanto como tal como en sus condiciones". Íd., pág. 431.

En el caso ante nos, la Registradora hizo las siguientes determinaciones relativas a la validez de la rescisión[26] efectuada entre el Banco y el Estado:

> 2. Indebida disposición de propiedad pública en violación de las leyes investidas de orden público.
> 3. Ningún funcionario público tiene facultad en ley para so color de rescisión disponer a título gratuito de propiedad pública.
>
> .    .    .    .    .    .    .    .    .    .
>
> 5. La transacción pretendida viola la reglamentación vigente en materia de disposición de propiedad pública. (Véase Título 15 LPRA Sec. 45 y S.S. y Título 28 Sec. 31 y S.S.).
> 6. No hay causa de ley alguna que permita la acción rescisoria que pretende la escritura #171 titulada "Rescisión de Dedicación Provisional, Segregación y Cesión Permanente para Uso Público".

En esencia, lo que alega la Registradora es que este acto jurídico se hizo en violación de la ley. Específicamente señala como las disposiciones violentadas la Ley Núm. 156 de 11 de mayo de 1948 (15 L.P.R.A. secs. 45–51) y la Ley Núm. 12 de 10 de diciembre de 1975 (28 L.P.R.A. secs. 31–31o).

La Ley Núm. 156 de 11 de mayo de 1948, en su Art. 1 (15 L.P.R.A. sec. 45) dispone que la Junta de Planificación podrá combinar aquellas parcelas que hayan sido reservadas o se reserven en lo futuro para parques en urbanizaciones o requerir el título a favor del Estado cuando no puedan combinarse con áreas similares en parcelas contiguas. Al otorgamiento de la escritura comparecerá el

---

[26] Aunque en la escritura se le denominó rescisión, la transacción en cuestión no configura ésta. La rescisión de los contratos está regulada por el Código Civil en los Arts. 1242–1251 (31 L.P.R.A. secs. 3491–3500), y sólo puede ejercitarse en las situaciones específicas allí contempladas. Véase L. Díez Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, págs. 313–318.

Administrador de Parques y Recreo Públicos([27]) en representación del Estado. Esta ley también dispone para la venta en subasta pública de las antedichas parcelas.([28]) Para ello requiere que la Junta de Planificación autorice la venta. Finalmente provee para la creación de un fondo con los ingresos provenientes de las ventas de solares. Este dinero se utilizará para la adquisición de parcelas para parques de vecindad o en la construcción de facilidades de recreo en las parcelas adquiridas. 15 L.P.R.A. secs. 48–51.

Contrario a lo señalado por la Registradora, esta ley, por sus propios términos, no es de aplicación a la situación de autos. Lo que la Ley Núm. 156, *supra*, establece es un procedimiento para la venta de parcelas. Para poder realizar esta venta específicamente requiere la autorización de la Junta de Planificación. Además, dispone que el producto de la venta ingresará al fondo antes mencionado. La situación ante nuestra consideración es totalmente distinta de la que se pretende regular con esta ley. En nuestro caso lo que se procuraba no era la venta de la parcela cedida al Estado,

---

[27] A partir de la creación del Departamento de Recreación y Deportes, esta función pasó a su Secretario. En este sentido se dispone en el Art. 24 de la Ley Núm. 126 de 13 de junio de 1980:

"Todas aquellas leyes, reglas, reglamentos y órdenes aplicables a la Administración de Parques y Recreo Públicos, que no estén en conflicto con las disposiciones de este Capítulo, continuarán en vigor hasta que los mismos sean enmendados, derogados o sustituidos y se entenderá que a partir de la vigencia de esta ley, se relacionan, refieren y serán administradas por el Departamento de Recreación y Deportes y *su Secretario, quien será para todos los efectos, el sucesor legal del Administrador de Parques y Recreo Públicos*, con todos los poderes, prerrogativas y obligaciones y privilegios pertinentes a dicha posición." (Énfasis suplido.) 3 L.P.R.A. sec. 442w.

Véase Op. Sec. Just. Núm. 1982–22.

[28] El Art. 3 de la Ley Núm. 156 de 11 de mayo de 1948 señala sobre este particular:

"El Administrador de Parques y Recreo Públicos, en representación del Estado Libre Asociado de Puerto Rico, podrá vender en pública subasta estas parcelas, ingresando el producto en el fondo que por las secs. 45 a 51 de este título se establece, siempre y cuando que:

"(1) La Junta de Planificación autorice dicha venta.

"(2) Antes de la proposición de venta se celebre una vista pública que deberá anunciarse en la prensa con no menos de quince (15) días a la fecha señalada para la vista ante el Administrador de Parques y Recreo Públicos, en el sitio más cercano posible donde esté ubicada la parcela que desee venderse, donde se dé oportunidad a todos los ciudadanos a comparecer y expresar sus puntos de vista en relación a la proyectada venta en pública subasta." 15 L.P.R.A. ant. sec. 47 (ed. 1961).

sino una modificación de esa cesión. El Estado no se desprendió de la parcela a cambio de un precio, sino que contrató un cambio en el objeto de la cesión original. Esta modificación fue expresamente autorizada por A.R.Pe. La ausencia de un contrato de compraventa entre el Estado y el Banco hace inaplicable el Art. 3 de la Ley Núm. 156 (15 L.P.R.A. sec. 47). Esto es así porque el susodicho artículo lo que hace es disponer el procedimiento a seguirse previo a la venta de estas parcelas por el Estado.

La Registradora también señala que el contrato habido entre el Estado y el Banco viola lo prescrito en la Ley Núm. 12, *supra*. Esta ley faculta al Secretario de Transportación y Obras Públicas para vender, permutar o gravar terrenos propiedad del Estado así como los edificios que tenga bajo su custodia. Como requisito para estos negocios la ley exige que los terrenos y edificios hayan dejado de ser de utilidad pública y que la transacción resulte beneficiosa para los intereses públicos. De igual manera faculta al Secretario de Transportación y Obras Públicas para disponer el arrendamiento de terrenos, edificios o espacios en edificios bajo su custodia que sean propiedad del Estado, cuando ello fuese necesario o beneficioso para el interés público. Art. 1 de la Ley Núm. 12, *supra*, 28 L.P.R.A. sec. 31. La ley también establece el procedimiento a seguir en estos casos.

Los antecedentes de esta ley los encontramos en el Art. 135 del Código Político, 1902 Estatutos Revisados y Códigos de Puerto Rico 379; Ley Núm. 441 de 14 de mayo de 1947 (28 L.P.R.A. sec. 11n), y la Ley Núm. 182 de 5 de de mayo de 1949 (28 L.P.R.A. sec. 6n). El Art. 135 del Código Político, *supra*, facultaba al Comisionado de lo Interior para vender o arrendar, por un período que no excediera de quince (15) años, terrenos propiedad de la Isla de Puerto Rico.[29] La Ley Núm. 441, *supra*, establecía que si el Pue-

---

[29] El Art. 135 del Código Político disponía en particular:

"Art. 135.—El Comisionado del Interior podrá, previa aprobación del Consejo Ejecutivo, disponer el arrendamiento, por un período que no exceda de quince años;

blo de Puerto Rico, un departamento, agencia o instrumentalidad suya decidía enajenar, total o parcialmente, bienes expropiados, las personas que fueron expropiadas de estos bienes tendrían un derecho preferente para readquirirlos. Art. 1 de la Ley Núm. 441, *supra*, Leyes de Puerto Rico 921–923 (31 L.P.R.A. sec. 2362). Finalmente, el Art. 1 de la Ley Núm. 182, *supra*, 28 L.P.R.A. sec. 6n, facultó al Comisionado de lo Interior para permutar, vender o arrendar terrenos del Pueblo de Puerto Rico que dejasen de ser de utilidad pública. 1949 Leyes de Puerto Rico 575. Además, se le autorizaba para compensar por la remoción de estructuras, cuando ésta fuese necesaria para cualquier obra de utilidad pública. Art. 2 de la Ley Núm. 182, *supra*, Leyes de Puerto Rico 575–577.

La Ley Núm. 12, *supra*, derogó las antedichas disposiciones. Mediante ésta se recogió en un solo estatuto todas las disposiciones relativas a venta, permuta, gravamen y arrendamiento de terrenos y edificios propiedad del Estado.[30] El Secretario de Hacienda en su Memorial Explicativo sobre el P. del S. 1599, proyecto originador de la Ley Núm. 12, señala que la finalidad de éste es "obtener recursos económicos para el erario". "Una forma positiva

---

y con el consentimiento de la Asamblea Legislativa, la venta de todos los terrenos cedidos a la Isla de Puerto Rico por los Estados Unidos o que en adelante le cedieren éstos o de otro modo adquiridos." 1902 Estatutos Revisados y Códigos de Puerto Rico 379.

[30] En el *Informe de las Comisiones de Transportación y Obras Públicas y de lo Jurídico Civil del Senado* sobre el P. del S. 1599, proyecto que dio origen a la Ley Núm. 12, se expresó que la intención primaria de éste fue:

"... [P]oner en una sola pieza legislativa la autoridad del Secretario de Transportación y Obras Públicas referente a la enajenación y arrendamiento de propiedad del Estado Libre Asociado y establecer un procedimiento específico como instrumento complementario del derecho sustantivo.

"La medida no tiene por objeto la creación de un estado innovador de derecho. Puesto que la situación de derecho ya estaba contemplada aunque diseminada en el Artículo 135 del Código Político de 1902; la Ley Núm. 18[5] de 5 de mayo [de 1949] y Ley Núm. 441 de 4 de mayo de 1949(sic)." *Informe de las Comisiones de Transportación y Obras Públicas y de lo Jurídico Civil del Senado* sobre el P. del S. 1599 de 11 de octubre de 1975, pág. 1. Véase, además, *Informe Conjunto de las Comisiones de Gobierno y Transportación y Obras Públicas de la Cámara de Representantes* sobre el P. del S. 1599 de 31 de octubre de 1975, 7ma Asamblea Legislativa, 9na Sesión Ordinaria, pág. 6.

de allegar ingresos y a la vez ponerlos en uso productivo sería mediante la venta de propiedades del Estado no dedicadas a fines públicos, ni que lo serían por su condición o no se planean sean usadas para un fin público en un futuro previsible." Memorial Explicativo del Secretario de Hacienda sobre el P. del S. 1599, pág. 1. Véase, además, Informe Conjunto de las Comisiones de Gobierno y de Transportación y Obras Públicas de la Cámara de Representantes sobre el P. del S. 1599 de 31 de octubre de 1975, 7ma Asamblea Legislativa, 9na Sesión Ordinaria, pág. 11.

En el debate realizado en la Cámara de Representantes se aclaró que esta ley sólo permitiría la venta o el arrendamiento de terrenos o edificios del Estado que no puedan usarse para obra pública alguna. En este sentido expresó el representante Morales Meléndez:

> Pero fíjese el compañero que en el caso de que se haya de vender o de arrendar una propiedad del Estado, bajo la custodia del Secretario de Transportación y Obras Públicas, será cuando ya se haya determinado que esa propiedad no tiene ya una utilidad pública desde el punto de vista de Gobierno, es decir, para construir unas escuelas, para construir un proyecto de vivienda, etc. Cuando se haya determinado que ya, no tiene una utilidad pública entonces será que podrán ponerse a la venta o formalizarse contratos de arrendamientos con entidades particulares. Debate de la Cámara de Representantes sobre el P. del S. 1599 de 3 de noviembre de 1975, pág. 6.

Los Arts. 4–11 de la ley disponían el procedimiento a seguir en relación con bienes expropiados. El Art. 12, sobre bienes adquiridos de otra manera, señalaba:

> Los bienes que no hubieren sido adquiridos mediante el procedimiento de expropiación forzosa, podrán ser enajenados por su valor, en el mercado según tasación que para dichos fines apruebe el TITULAR.
> La venta se llevará a cabo siguiendo los procedimientos establecidos en esta ley sobre publicación de edictos y celebración de subasta pública, a menos que los terrenos hayan estado ocupados por un período mayor de 10 años por familias que no

posean otra propiedad donde residir. En estos casos el TITU-LAR les venderá directamente a dichas familias al precio en el mercado. Art. 12 de la Ley Núm. 12, *supra*, Leyes de Puerto Rico 1055, 1059.

En esencia, este artículo permitía la enajenación[31] de bienes adquiridos de otra manera que no fuera la expropiación forzosa. Sin embargo, la alusión a la compraventa, en su segundo párrafo, nos permite concluir que el propósito de este artículo es regular el procedimiento a usarse en la venta de estos bienes. A éstos fines señala que el precio será el valor que tengan en el mercado los bienes y que la venta se realizará mediante subasta pública, a menos que los terrenos hayan estado ocupados por un período mayor de diez (10) años por familias que no posean otra propiedad donde residir. En este caso no se realizará subasta pública, sino que se les venderá a ellos directamente.

Los artículos referentes a bienes expropiados son inaplicables a los hechos ante nos, pues no fue mediante expropiación forzosa que el Estado adquirió la parcela en controversia. Por lo tanto, nos resta determinar si el antedicho Art. 12 de la Ley Núm. 12, *supra*, le aplica. Según señalamos, el Art. 12 de la Ley Núm. 12, *supra*, lo que dispone es el procedimiento a seguir en casos de venta de bienes. La situación ante nos no constituyó una venta, por lo tanto, no era necesario seguir el procedimiento prescrito por este artículo.

Además, la Ley Núm. 12, en su Art. 1, *supra*, limita su

---

[31] El término "enajenación" se refiere a "[l]a transmisión de la propiedad de una cosa, a cambio de otra (como en la compraventa o en la permuta) o gratuitamente (como en la donación y el préstamo sin intereses) .... [E]n el lenguaje común, incluso de los juristas, por *enajenación* se entiende venta; porque, en otro caso, se concreta que se trata de donación o regalo, que por actitud liberal posee singular característica. En una consideración genérica de enajenación se comprenden, además de los cuatro contratos más habituales que la concretan y enumerados en la definición primera, las disposiciones de última voluntad y todas las formas de traspaso o cesión de bienes y derechos. Son enajenables, o susceptibles de enajenación, cuantas cosas están en el comercio de los hombres, sean corporales o incorporales, presente o futuras, sin otras excepciones que las expresas de la ley o las génericas de ilicitud e imposibilidad." *Diccionario Enciclopédico de Derecho Usual*, 20ma ed., Buenos Aires, Ed. Heliasta, 1981, Vol. III, pág. 437.

aplicabilidad a bienes que dejen de ser de utilidad pública. Para este tipo de bienes, exclusivamente, señala el procedimiento que se utilizará en su enajenación. Un examen del negocio contenido en la Escritura Núm. 171 nos demuestra que la parcela denominada "parque" no carecía de utilidad pública, pues de ésta se segregó y cedió al Estado una nueva parcela denominada "parque activo". El Estado no la enajenó para allegarse recursos económicos. Como resultado del negocio el Estado advino dueño de una parcela para ser dedicada a fines públicos. El contenido del negocio habido entre el Estado y el Banco hace claramente inaplicable a éste la Ley Núm. 12, *supra.*

La Ley Núm. 82 de 2 de julio de 1987 (28 L.P.R.A. secs. 31n, 31a, 31c–31d, 31g–31i, 31k), enmendó sustancialmente la Ley Núm. 12, *supra.*[32] Las disposiciones que sólo aplicaban a terrenos adquiridos mediante expropiación forzosa se hicieron extensivas a bienes adquiridos en cualquier otra forma.[33] El citado Art. 12 fue enmendado ampliamente. A éste se le incorporaron disposiciones relativas a cesiones voluntarias y cesiones requeridas por el Estado. El nuevo Artículo dispone:

Los bienes adquiridos por el titular para cuya enajenación

---

[32] Al momento de la calificación de la Registradora, febrero de 1989, la ley había sido enmendada en dos (2) ocasiones. Ley Núm. 63 de 27 de mayo de 1976 (28 L.P.R.A. sec. 31); Ley Núm. 82 de 2 de julio de 1987 (28 L.P.R.A. secs. 31n, 31a, 31c–31d, 31g–31i, 31k). La Ley Núm. 63 de 1976 sólo enmendó el inciso (b) del Art. 1, relativo al arrendamiento de terrenos, edificios o espacios en edificios. 1976 Leyes de Puerto Rico 194–195. Esta enmienda no es pertinente a la controversia ante nos.

[33] En este sentido se expresó en el Informe de las Comisiones de Gobierno Estatal, Transportación y Obras Públicas y Asuntos Urbanos del Senado sobre el P. del S. 1149, proyecto que dio origen a la Ley Núm. 82:

"Dichas enmiendas proveen un mecanismo uniforme para la administración y enajenación de propiedad del Estado Libre Asociado de Puerto Rico que han dejado de ser de utilidad pública, independientemente del modo de adquisición.

"Al establecer dicha uniformidad se pretende resolver los problemas que han surgido al implantar la ley vigente.

"La presente medida agilizará los trámites administrativos, reducirá los costos de mantenimiento de las referidas propiedades y aumentará los ingresos del erario público." Informe de las Comisiones de Gobierno Estatal, Transportación y Obras Públicas y Asuntos Urbanos del Senado sobre el P. del S. 1149 de 9 de mayo de 1987, 10ma Asamblea Legislativa, 3ra Sesión Ordinaria, págs. 4–5.

esta ley no haya establecido el precio de venta, serán enajena-
dos por su valor en el mercado según tasación que para dichos
fines apruebe el titular, siguiendo los procedimientos estableci-
dos en esta ley. En los casos de terrenos adquiridos por el Es-
tado mediante *cesión voluntaria* para destinarse a un fin pú-
blico específico, dichos terrenos revertirán gratuitamente a su
antiguo dueño o a su sucesión, de haber revocado el donante
dicha donación dentro de los términos prescriptivos estableci-
dos, si no se hubiera destinado el predio a dicho fin público
específico, o de haber cesado el mismo.
   *Esto no será de aplicación en aquellos casos de cesiones reque-*
*ridas por la Junta de Planificación u otra dependencia del*
*Estado.* Se dispone, además, que en aquellos casos en que el
Estado posea terrenos donde enclavan estructuras de personas
particulares, independientemente de cómo fueron adquiridos
los terrenos, y para lo cual no se haya dispuesto en esta ley, se
aplicarán las disposiciones del Código Civil como derecho
supletorio. (Énfasis suplido y escolios omitidos.) Art. 12 de la
Ley Núm. 82, *supra*, Leyes de Puerto Rico 319.

En el Memorial Explicativo sobre las enmiendas se dis-
cutió el alcance y propósito de los cambios incorporados en
el Art. 12.([34]) Allí se expresó, entre otras cosas, que se ex-

---

([34]) "Otro aspecto de la Ley Núm. 12 que nos preocupa es que nada dispone
sobre los bienes adquiridos por el Estado mediante Cesión Voluntaria (no impuesta
por el Estado) para ser dedicados a uso público específico.

"Proponemos que dichos bienes reviertan a su antiguo dueño o a sus sucesores
cuando cese el fin público para el cual fue cedido siempre que así lo solicitare antes
de que hayan transcurrido los términos prescriptivos. De haber mejoras en dichos
predios el precio de adquisición de las mismas será el valor en el mercado. El término
prescriptivo comienza a correr desde el momento en que cesa el fin público para el
cual fue cedido.

"Al cederse por el propietario unos terrenos para un fin público determinado, se
manifiesta implícitamente la intención de dicho propietario que esa propiedad re-
vierta gratuitamente a su patrimonio al cesar dicho fin público, sin necesidad de que
expresamente se consigne una cláusula de reversión en el *contrato de cesión. En los*
casos de cesión voluntaria al Estado para un fin público específico, más aún, debe
estar protegido el derecho del anterior dueño y su derecho preferente a la readqui-
sición gratuita al cesar dicho fin público. Tenemos que considerar la acción de ci-
vismo y cooperación de cualquier ciudadano para con el Estado al desprenderse de su
haber patrimonial gratuitamente. Mas [sic] bien entendemos que si el dueño ante-
rior manifiesta su interés en la propiedad le revierta a su patrimonio y ejercita ese
derecho dentro del término establecido por la ley y la jurisprudencia (siempre y
cuando no se hubiere perfeccionado algún tipo de prescripción adquisitiva a favor del
Estado de acuerdo al Código Civil vigente) no hay lugar a dudas de que el Estado
debe devolver sin costo alguno la cosa cedida a su antiguo dueño, por haber cesado el
fin para el cual la cedió, independientemente si se expresa o no alguna cláusla [sic]
de reversión en el contrato cesión.

cluía de "esta enmienda cualquier otro tipo de cesión gratuita al Estado, la cual sea en cumplimiento a las disposiciones o reglamentos de cualquier agencia o dependencia del Estado". Memorial Explicativo del P. del S. 1149 de 2 de julio de 1987, pág. 7.

Resulta innecesario determinar si las enmiendas de la Ley Núm. 82, *supra*, aplican a la situación ante nos. Veamos por qué. La Escritura Núm. 171, objeto de este recurso, fue otorgada el 7 de octubre de 1983. Por lo tanto, las enmiendas provistas por la Ley Núm. 82, *supra,* no pueden ser aplicadas al negocio concluido por el Estado y el Banco en 1983. La Registradora erró al así hacerlo. En todo caso el texto aplicable sería el aprobado en 1975. Éste ya lo examinamos y determinamos que no regula la situación en controversia.[35] Por lo tanto, erró la Registradora al concluir que el negocio jurídico recogido en la Escritura Núm. 171 era inválido por violar la ley.

Consideremos ahora la calificación que hizo la Registradora con relación a la resolución de A.R.Pe., que fue presentada como documento complementario. En cuanto a ésta, la Registradora notificó la siguiente falta:

> La resolución emitida por ARPE el 24 de agosto de 1983 en el caso #65–1706 Lot. la cual se acompaña como documento complementario es nula de su propia faz. Ningún funcionario administrativo tiene facultad en ley para determinar por sí mismo que se deja sin efecto la dedicación a uso público provisional de la parcela para parque con cabida de 3.9795 cdas.

Al igual que hemos hecho al considerar las anteriores faltas, examinaremos primero los principios generales de

---

"En adición, esta actuación del Estado estimularía a otras personas a hacer donaciones al Estado para fines públicos en la certeza de que la propiedad se revertirá a su patrimonio al cesar dicho fin público." Memorial Explicativo del P. del S. 1149 de 2 de julio de 1987, págs. 6–7.

[35] La Ley Núm. 12 de 10 de diciembre de 1975 (28 L.P.R.A. secs. 31–31o), ha sido enmendada en dos (2) ocasiones adicionales. Ley Núm. 76 de 18 de agosto de 1989 (28 L.P.R.A. secs. 31n., 31a, 31h y 31k); Ley Núm. 122 de 24 de diciembre de 1991 (28 L.P.R.A. secs. 31–31a, 31c y 31k). Ambas leyes provocaron alteraciones en el texto del Art. 12. Véanse: 1989 Leyes de Puerto Rico 374–377; 1991 Leyes de Puerto Rico 979–983.

Derecho Hipotecario que le son aplicables. En este caso los relativos a la calificación de documentos administrativos.

El Art. 64 de la Ley Hipotecaria, *supra*, señala que la calificación de documentos administrativos es similar, en su alcance o extensión, a la calificación de documentos judiciales. Sobre este particular el artículo dispone, en su parte pertinente:

> En cuanto a los documentos expedidos por la [a]utoridad [j]udicial, la calificación expresada se limitará: (1) a la jurisdicción y competencia del tribunal; a la naturaleza y efectos de la resolución dictada si ésta se produjo en el juicio correspondiente; y si se observaron en él los trámites y preceptos esenciales para su validez; (2) las formalidades extrínsecas de los documentos presentados; y (3) a los antecedentes del Registro.
>
> Cuando se trate de documentos administrativos la calificación quedará referida, en lo pertinente, a los extremos consignados en el párrafo anterior. 30 L.P.R.A. sec. 2267.

Examinemos lo que han señalado algunos tratadistas sobre el alcance de la calificación de documentos administrativos.

Morrell y Terry sostiene que debido a que el alcance de la calificación de documentos administrativos es igual al de la calificación de documentos judiciales, los registradores no pueden examinar los fundamentos de las decisiones de las agencias administrativas. En este sentido señala en su tratado que:

> ...[L]os principios establecidos para fijar hasta dónde llega la facultad de los Registradores para calificar los documentos judiciales, son aplicables a los documentos que expidan las demás Autoridades o funcionarios públicos cuando representan a la Administración.
>
> Los Registradores se abstendrán, por lo tanto, de calificar los fundamentos de las decisiones de carácter administrativo, y respetarán y cumplirán los acuerdos firmes que dicten las Autoridades de ese orden, teniendo presente ... que, en general, las resoluciones de la Administración en los asuntos de competencia, no han de ser nunca discutidas por el Registrador.
>
> Pero en cambio, ha de apreciar siempre el Registrador la competencia del funcionario, la autenticidad del documento y

su naturaleza en relación con el acto que ha de inscribirse, que puede exigir ya una ley, o un Real decreto, o una Real orden o el acuerdo de determinado Ministro, Autoridad o funcionario, o el cumplimiento de determinadas formalidades, como la subasta o el concurso, o la escritura, o el acta, etcétera, y apreciará también, en general, toda clase de formas extrínsecas del documento, y los obstáculos que puedan derivarse del Registro, de la ley Hipotecaria o de leyes especiales. J. Morrell y Terry, *Comentarios a la legislación hipotecaria*, 2da ed., Madrid, Ed. Reus, 1927, T. II, pág. 271.

Roca Sastre acepta que los documentos administrativos deben ser calificados de igual manera que los judiciales. Sin embargo, señala, sin abundar en ello, que en la calificación de documentos administrativos el registrador goza de mayor libertad que con los judiciales. Roca Sastre y Roca-Sastre Muncunill, *op. cit.*, T. II, pág. 274.

Chico y Ortiz, por su parte, rechaza que la calificación de documentos administrativos sea de igual alcance que la calificación de documentos judiciales. Este fundamenta su oposición en las diferencias existentes entre el procedimiento judicial y el administrativo.[36]

En 1982 se enmendó el Art. 99 del Reglamento hipotecario español para señalar de manera específica el ámbito de la calificación de documentos administrativos. Este artículo dispone:

La calificación registral de documentos administrativos se extenderá, en todo caso, a la competencia del órgano, a la congruencia de la resolución con la clase de expediente o procedimiento seguido, a las formalidades extrínsecas del documento presentado, a los trámites e incidencias esenciales del procedi-

---

[36] En este sentido expresó en su obra *Teoría, Práctica y Fórmula de Calificación Registral*:

"Lo que verdaderamente impresiona del documento administrativo es el trato de igualdad que la doctrina ha tenido con el judicial, aún y a pesar de que, como hemos visto, jurisdicción y administración son términos que asépticamente separan los autores con esa finura que los médicos diseccionan venas, arterias, músculos y nervios. Si el documento judicial es distinto del administrativo, si proceso y procedimiento son términos antagónicos, si jurisdicción y administración se vuelven la espalda, ¿por qué a la hora de la calificación todo es parejo, todo es idéntico?" J.M. Chico y Ortiz, *Teoría, práctica y fórmula de la calificación registral*, Madrid, Ed. Marcial Pons, 1977, pág. 183.

miento, a la relación de éste con el titular registral y a los obstáculos que surjan del Registro. Ley y Reglamento Hipotecario, 8va ed., Madrid, Boletín Oficial del Estado, 1986, pág. 248.

Aun después de esta enmienda, Chico y Ortiz mantiene su posición de que la calificación de los documentos administrativos debe ser más amplia que la de los documentos judiciales. En específico señala que ésta debe extenderse al examen de la validez del acto contenido en el documento. J.M. Chico y Ortiz, *Estudios sobre Derecho Hipotecario*, 2da ed., Madrid, Ed. Marcial Pons, 1989, T. I, págs. 675–676.

El Art. 64 de nuestra Ley Hipotecaria es claro al reglamentar la calificación de documentos administrativos. Debemos, por lo tanto, ceñirnos a sus disposiciones al respecto. La divergencia de criterio entre los tratadistas no aconseja otra cosa. Por lo tanto, la calificación de los documentos administrativos se limitará a examinar: (1) la jurisdicción y competencia de la agencia; la naturaleza y efectos de la resolución dictada, si se produjo en el procedimiento correspondiente y si se observaron en él los trámites y preceptos esenciales para su validez; (2) las formalidades extrínsecas de los documentos presentados, y (3) los antecedentes del Registro de la Propiedad. Véase Vázquez Bote, *op. cit.*, Vol. XV–II, pág. 316.

Aunque anteriormente no habíamos examinado el ámbito de la calificación de documentos administrativos, sí nos habíamos expresado sobre la extensión de ésta para los documentos judiciales. Habida cuenta de que la calificación de ambos tipos de documentos es similar, consideramos pertinente repasar algunos pronunciamientos nuestros relativos a la calificación de documentos judiciales. En *P.R. Prod. Credit Assoc. v. Registrador*, 123 D.P.R. 231, 236 (1989), señalamos que la calificación de documentos judiciales es más limitada que la calificación de documentos notariales.

> En resumen, en lo relativo a la calificación de documentos judiciales, el Art. 64 de la Ley Hipotecaria, *supra,* y la Sec. 2003–79.1 de su reglamento incorporaron el enfoque restrictivo jurisprudencial. ... De acuerdo con esta visión legislativa, debe quedar claro que *el Registrador de la Propiedad no puede ser juez de jueces.* Después de todo, debe recordarse el principio general de que el registro no da ni quita derechos. Por ende, el principio de legalidad consagrado en el Art. 64 de la Ley Hipotecaria, *supra,* hay que interpretarlo en armonía con esa máxima y propósito legislativo de facilitar el acceso al registro de documentos, en particular, las providencias judiciales. (Énfasis suplido.) Íd., págs. 237–238.

Posteriormente, en *U.S.I. Properties, Inc. v. Registrador,* supra, pág. 469, declaramos que, como regla general, el Registrador no puede intervenir con las determinaciones judiciales.

A la luz de la normativa expuesta, pasemos a considerar la actuación de la Registradora. Esta determinó que la resolución de A.R.Pᴇ. es nula. Como fundamento señaló que "ningún funcionario administrativo tiene facultad en ley para determinar por sí mismo que se deja sin efecto la dedicación a uso público provisional de la parcela para parque con cabida de 3.8795 cdas". Al calificar la resolución administrativa la Registradora hizo un juicio evaluativo sobre la validez sustantiva de la actuación de A.R.Pᴇ. Asunto que, como hemos señalado, es ajeno al ámbito de la calificación de este tipo de documentos. Por lo tanto, erró la Registradora al entrar a considerar la corrección en derecho de la actuación de A.R.Pᴇ.

En conclusión, en cuanto a las faltas notificadas 2–6, relativas a la validez del negocio jurídico habido entre el Banco y el Estado, la Registradora actuó incorrectamente. Su calificación excedió el ámbito de lo permitido por ley, de acuerdo al Art. 64 de la Ley Hipotecaria, *supra.*[37]

---

[37] En vista de lo antes discutido y resuelto es innecesario entrar a considerar la alegación del recurrente sobre la existencia de una condición resolutoria tácita en el contrato de cesión que aparece en la Escritura Núm. 32 de 22 de agosto de 1968, autorizada por el notario Manuel García Malatrasi.

## V

*Conclusión*

Aunque la Registradora erró al calificar la validez sustantiva de la Escritura Núm. 171 y la resolución de A.R.Pe., ésta actuó correctamente al señalar el problema de falta de tracto y requerir la acreditación de las facultades representativas del Sr. Edwin Rivera Paulo.[38]

Por lo tanto, confirmaríamos su nota denegatoria.[39]

---

[38] Según señaláramos antes, las restantes faltas notificadas fueron consentidas.

[39] Sin embargo, si la parte recurrente así lo interesa podría, como señaláramos antes, corregir el defecto relativo a la constancia de la capacidad representativa del Departamento de Recreación y Deportes mediante un acta notarial. De igual manera, en cuanto a la falta de acreditación de las facultades representativas del señor Rivera Paulo, la parte recurrente, si lo estima conveniente, puede presentar al Registro los documentos que acrediten ésta.